**GEO–CON, INC., Plaintiff,**

v.

**UNITED STATES of America, et al., Defendants.**

**Civ. A. No. 94–0820.**

United States District Court, District of Columbia.

May 31, 1994.

**538**

Douglas Leo Patin, Spriggs & Hollingsworth, Washington, DC, for plaintiff.

Patricia Daniells Carter, U.S. Attorney's Office, Washington, DC, for defendants.

## MEMORANDUM OPINION AND ORDER

SPORKIN, District Judge.

This is an action by a disappointed bidder arising from plaintiff Geo–Con's nonselection for a solicitation issued by the Army Corps of Engineers. Plaintiff was the low bidder but was not selected after a determination of nonresponsibility. Pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, Plaintiff challenges the Army Corps of Engineers' nonresponsibility determination and the decision to not award the contract to Geo–Con as arbitrary and capricious, an abuse of discretion, and not in accordance with law.

The matter comes before the Court on plaintiff's motion for a preliminary injunction and defendants' motion for summary judgment. The Court has considered the motions, all opposition thereto, and heard argument by the parties. Plaintiff's motion for a preliminary injunction will be denied. Defendant's motion for summary judgment will be granted.

### The Undisputed Facts

On December 7, 1993 the Army Corps of Engineers, Kansas City District issued solicitation DACW41–94–0020 for the construction of a project known as the "Lang Superfund Site, Groundwater Redemption System, Pemberton Township, New Jersey." The solicitation described the work to be performed as "the construction of a groundwater extraction, treatment, and reinjection system for remediating contaminated groundwater on the site." Complaint ¶ 9. The solicitation invited sealed bids on a firm fixed-price basis. Applicable acquisition procedures provided that the contract was to be awarded to the lowest responsive and responsible bidder.

Twelve firms bid on the solicitation. The bid opening was held on February 10, 1994. Geo–Con, the plaintiff in this action, was the lowest bidder at $4,995,825.00. R.E. Wright was second lowest at $5,401,653.00. The government estimate had been $7,351,980.00. The day of the bid opening Geo–Con was advised that it was the apparent low bidder and was asked to submit certain information in support of a pre-award survey. On February 11, 1994, Geo–Con was asked to submit additional information required by the solicitation. Geo–Con sent the requested pre-award survey information on February 14 and the additional solicitation information on February 17, 1994.

On February 25, 1994, the Corps of Engineers' Project Engineer, David Ohsiek, wrote a memorandum for the record setting forth his pre-award survey of Geo–Con as a prospective contractor. This memorandum contained positive information about Geo–Con's financial and organizational resources. In addition, the memorandum noted that Geo–Con had completed contracts for the Corps of Engineers for the construction of slurry trenches, and for the removal of underground storage tanks, receiving satisfactory performance evaluations.

The memorandum also contained negative information. One of Geo–Con's references for the Lang bid was the Weyerhauser Company, for whom Geo–Con had completed 95 percent of the work on a $5 million contract to develop a system for tapping groundwater in the area of an Arkansas papermill. Wey-

erhauser's representative for this contract was contacted by the Corps' Project Engineer for a recommendation concerning Geo–Con's work. As the Project Engineer wrote in the memorandum, the Weyerhauser official gave a negative reference:

> [Weyerhauser's representative] stated several of the pumps and pipes in the system had become clogged with sand and silt from the ground in which the trenches were excavated. Geo–Con has refused to correct the problems under warranty and will do nothing unless Weyerhauser will pay them additional money. Weyerhauser is very dissatisfied and is about to begin legal litigation with Geo–Con.

Administrative Record, Ex. 3, ¶ 6.a.

The Project Engineer also detailed Geo–Con's prior work on a $4 million contract in 1991 for the Corps of Engineers at the Bruin Lagoon Superfund Project in Pennsylvania. The primary work of that project was to stabilize hazardous sludge materials in an industrial waste pond. A smaller part of the work was the decontamination and disposal of residual water in the pond. The residual water contained dangerous acid and sulphur dioxide which were to be removed via a temporary treatment plant. Geo–Con was then to test the water for purity before dumping it in a nearby creek. Geo–Con also had responsibility for preventing hazardous amounts of the acid and sulfur dioxide from contaminating the air at the site. As related in the Lang pre-award survey memorandum, Geo–Con's performance was unsatisfactory at the Bruin Lagoon Project:

> According to the Corp's Project Engineer, Geo–Con had little, if any, experience in this kind of work and consequently bid too low for the [Bruin Lagoon] contract. In order to keep the work moving and increase contract earnings, Geo–Con's Site Superintendent and Site Safety and Health Officer falsified daily reports on water and air purity. They allowed contaminated water to be dumped into the creek, and toxic gases to be released into the air. Residents of houses near the work site were endangered by these irresponsible acts. The superintendent also inflated his payment estimates for water that had been decontaminated, by pumping air through the meter which measured water.
>
> Geo–Con and two of their employees were indicted for fraud after investigation by the U.S. Army CID and the Department of Justice. An agreement was reached with Geo–Con whereby they paid $300 thousand restitution to the U.S. Government. They were restricted from receiving one future contract with the U.S. Government, and the indictment against them was dismissed.... Geo–Con's Site Superintendent was convicted and sentenced to one year in prison and several months of house arrest; the Safety and Health Officer was convicted and sentenced to five months house arrest.

Administrative Record, Ex. 3 ¶ 7a–b. Project Engineer Oshiek concluded that Geo–Con's failure on the Bruin Lagoon Project did not bode well for Geo–Con's success on the Lang Project, because the two projects involved similar work:

> Geo–Con has no previous satisfactory experience in the type of work that is required for the Lang Superfund Site Groundwater Treatment. Their only similar experience was in the Bruin Lagoon Superfund Project, for which the Corps of Engineers rated their performance unsatisfactory.... The Corps Project Engineer has stated that the Geo–Con organization was implicated all the way to the top levels, although only the Site Superintendent and Site Safety and Health Officer were sentenced.

*Id.* ¶ 8.a.

Mr. Ohsiek, also took issue with the qualifications of Mr. Robert A. Larose, proposed by Geo–Con to be acting Project Manager for the Lang project. Ohsiek noted in the pre-award survey memorandum that Larose's background was mostly in marketing and did "not really qualify him for much else than administrative management of the company." *Id.* ¶ 8.g. Oshiek concluded that "Mr. Larose's qualifications do not provide enough expertise to justify award of the contract for Lang Superfund Site Groundwater Treatment Project to Geo–Con." *Id.*

At the Contracting Officer's request, Mr. Ohsiek wrote a supplemental memorandum

to the pre-award survey on March 15, 1994, after having contacted two additional Geo–Con references and having received new information. Administrative Record, Ex. 4. This second memorandum gave additional facts relating to Geo–Con's inexperience in the construction of wells, the pumping of water from or into wells, the sampling and testing of water for contamination, and the operation of treatment systems for decontaminating water. The second memorandum also supplemented Geo–Con's failure at the Weyerhauser site. Apparently, filter materials that should have been included in Geo–Con's original contract were included only as an option. Weyerhauser did not accept the filters as an option and the system clogged. The Corps' Project Engineer Mr. Ohsiek placed the blame for this failure on Geo–Con:

> The filter materials should not have been an optional item in the proposal; they should have been required, either as a standard feature for all the groundwater collection pipes; or wherever the trench backfill and ground conditions indicated a filter was necessary. This flaw in the proposal and the contract may have been an oversight of both Geo–Con and Weyerhauser, but it could have been recognized and corrected with a modification to the contract the first time the collection network clogged. By doing nothing to correct this problem, Geo–Con showed a lack of either experience or integrity, or both.

*Id.* ¶ 4.c. The second memo also detailed the failure of Geo–Con's bio-treatment unit, soon after the debut of the Weyerhauser system, due to the bio-polymer slurry that Geo–Con routinely uses in their trench excavation contracts. *Id.* ¶ 4.d-f. Mr. Ohsiek concluded his second memorandum with the recommendation that Geo–Con not be awarded the Lang Superfund contract because "Geo–Con, Inc. has not shown they have the experience necessary to adequately perform the Lang Superfund Site Groundwater Treatment system contract." *Id.* ¶ 5.

The Corps' Contracting Officer, Maj. Jeffrey Hills, considered the recommendations found in the pre-award survey and decided not to award the Lang contract to Geo–Con. Determinations and Findings, Administrative

Record Ex. 5. In addition to Geo–Con's failures at the Weyerhauser site and Bruin Lagoon, and the proposed project manager's lack of experience, Maj. Hills questioned Geo–Con's forthrightness and integrity. Major Hills found that the proposed project manager's experience had been affirmatively overstated by Geo–Con. In addition, Geo–Con had not mentioned the failed Bruin Lagoon project in the pre-award survey, and had failed to report its settlement agreement with the Department of the Army and the Environmental Protection Agency regarding Bruin Lagoon. While the settlement agreement appeared to provide for safeguards and affirmative steps to correct defects, the Contracting Officer in his findings emphasized that "Geo–Con had provided no evidence in the pre-award survey process to establish that it is in compliance with this agreement or that it has solved past performance problems." *Id.* ¶ 9. Major Hills found Geo–Con "non responsible," rejecting the bid "for lack of resources and relevant experience, deficient performance, and questionable business integrity and ethics." *Id.* ¶ 11. On March 30, 1994, the contract for the Lang Superfund Site was awarded to the second bidder, R.E. Wright.

This was the second time that Geo–Con had been found nonresponsible and been rejected for an Army Corps of Engineers contract. On December 16, 1991, Geo–Con had been rejected for the Montclair/West Orange & Glen Ridge Radium sites Remediation and Restoration in Essex County, New Jersey, on the basis of nonresponsibility because of the unsatisfactory performance evaluation from the Bruin Lagoon project. This agency action was upheld by Judge Stanley Harris in *Geo–Con, Inc. v. U.S.A.,* 783 F.Supp. 1 (1992).

Subsequent to learning that it had lost the Lang award at issue, Geo–Con asked to meet with the Contracting Officer to rebut the finding of nonresponsibility. The Contracting Officer met with Geo–Con officials and counsel in Kansas City on April 6, 1994. The company representatives made oral presentations and submitted documents. According to his declaration, Contracting Officer Hills considered the materials submitted by Geo–

Con at the April 6, 1994 meeting, but the additional information did not allay his doubts about the qualifications of the proposed project manager, or suggest that Geo–Con's problems at the Weyerhauser site had been resolved. *See* Administrative Record, Exhibit 1.

*Plaintiff's Argument*

Geo–Con argues that the Kansas City District of the Army Corps of Engineers has effectively debarred it from government contracts. Geo–Con alleges that the Kansas City District "has developed a bias against Geo–Con and has, in bad faith, utilized the pre-award survey procedure to conduct an improper, de facto debarment, thereby avoiding the safeguards in the regulations and the Constitution." Complaint ¶ 44. Geo–Con also takes issue with the facts on which the finding of nonresponsibility was based, contending that the Contracting Officer's determination was arbitrary, capricious, an abuse of discretion, and not in accordance with law. Geo–Con insists that it was not given an adequate opportunity to rebut the negative information in the pre-award survey, and was given no notice of the potential finding of lack of integrity.

As to the accuracy of the facts in the pre-award survey, Geo–Con first takes issue with the assertion that its proposed "project manager" lacked the necessary qualifications. Complaint ¶¶ 27–31. Geo–Con submits that the qualifications of the "project manager" were not identified as a responsibility criteria in the solicitation. Geo–Con then states that in providing the resume in question, it was only responding to a telephone request from Mr. Oshiek of the Kansas City District "for a copy of the resume of the person who would be managing the project." Complaint ¶ 30. Geo–Con claims that they interpreted this request as a demand for information about the "contract manager", i.e., the individual responsible for the management of the project at the corporate district office level, not the "on-site project manager." Complaint ¶ 31. Thus, Geo–Con claims that the Corps' determination that Geo–Con lacked relevant technical experience is arbitrary and capricious, because Geo–Con submitted the wrong resume when asked for the resume of "the

individual who would be managing the project."

Next, Geo–Con asserts that Weyerhauser had not rated Geo–Con's work unsatisfactory and that any problems with the Arkansas paper mill project were not Geo–Con's responsibility. The plaintiff has submitted an affidavit by its Weyerhauser project manager purportedly refuting the inaccuracies in the pre-award survey relating to Geo–Con's performance at the Weyerhauser project. *See* Affidavit of Richard W. Hanford, Jr. Yet, this affidavit itself provides proof that there are serious questions about Geo–Con's responsibility for the failures at the Weyerhauser project:

> Although Weyerhauser is involved in an investigation of a clogging problem which has occurred on the project, it is entirely possible that this is a design problem not attributable to Geo–Con.
>
> . . . .
>
> Weyerhauser accepted the groundwater trench system as Geo–Con completed it and utilized the work. Though a problem with siltation of the system has developed, Weyerhauser, Geo–Con, and the designer have not established the basis for the problem, though Geo–Con has made a recommendation to Weyerhauser concerning a method of investigation of the subsurface issue.
>
> . . . .
>
> With respect to the issue of the bio-polymer slurry. . . . [s]ince the completion of the work, some sections of the trenches have experienced clogging, but Geo–Con fully believes this is due to a design deficiency. Geo–Con has proposed to Weyerhauser a method of investigating this condition and is ready to work with it on this matter.

*Id.* In sum, Geo–Con's affiant admits to the problems at the Weyerhauser project, but denies responsibility for the inadequacies.

Next, Geo–Con takes issue with the Contracting Officer's references to Geo–Con's failure on the Bruin Lagoon project. Geo–Con provides evidence that it did not falsify daily reports on water purity and did not allow toxic gases to be released into the air.

*See* Affidavit of Richard W. Hanford. Geo–Con also maintains that the allegation that the company was "implicated all the way to top levels" is incorrect. Geo–Con itself was never indicted. Simply put, Geo–Con believes that it has unfairly been stigmatized by the criminal conduct of two past employees, on a project that is more than two years old. Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment, at 15.

What Geo–Con *cannot deny* is that its performance at Bruin Lagoon was woefully deficient and that as a result of that inferior performance Geo–Con entered into a settlement agreement with the government. Moreover, it is undisputed that Geo–Con did not alert the Lang Contracting Officer to its prior problems at Bruin Lagoon, nor did Geo–Con take any affirmative steps to demonstrate that it was in compliance with the settlement agreement.

Finally, Geo–Con argues that it should have been given notice that its integrity was being questioned and should have been given an opportunity to be heard on the specifics of these weaknesses prior to the award. Geo–Con argues that when a party's integrity is at stake, the party must be given the ability to rebut the negative information. At the hearing on the instant motions, the Court was led to believe that Mr. Oshiek of the Kansas City District had promised Geo–Con the opportunity to respond to negative information relating to Weyerhauser and Bruin Lagoon. An examination of the relevant Geo–Con affidavit refutes this allegation. Mr. Ohsiek of the Kansas City District told John V. Esmet, Geo–Con's estimator for the Lang Project, that he was making negative information about Bruin Lagoon and Weyerhauser available to the Contracting Officer and the Kansas City District's Contracting Department. Ohsiek further told Esmet "that Geo–Con would be contacted by a representative of the Contracting Officer *if it was necessary* for [Geo–Con] to respond to, or explain, any of the matters related to Weyerhauser of Bruin Lagoon." Affidavit of John V. Esmet, ¶ 6. This statement is a far cry from a promise that Geo–Con would be permitted to respond to negative information.

Based on the information gathered from the pre-award survey, from the Contracting Officer's perspective, it was not necessary to receive additional information from Geo–Con. Moreover, the Contracting Officer did meet with Geo–Con officials after the award. The Geo–Con officials presented their arguments, which were rejected by the Contracting Officer.

*Decision*

■ The standard for review of a disappointed bidder case was set forward by the D.C. Circuit in *Elcon Enterprises Inc. v. WMATA,* 977 F.2d 1472 (D.C.Cir.1992);

> [The] Court may not set aside federal agency procurement decisions unless they had "no rational basis" or the process by which they were reached "involved a clear and prejudicial violation of applicable statutes and regulations." We emphasize, as prior cases have, that a procurement decision is not "irrational" simply because we might have reached a different decision in the first instance.

*Id.* at 1478–79 (citations omitted). The Court believes that the complaint, the administrative record, and affidavits demonstrate that there is no genuine issue of material fact to be resolved in this matter. The Contracting Officer made an eminently rational and reasonable choice not to award the contract to Geo–Con. There is no evidence of a de-facto debarment.

An objective analysis of the facts leads to the correct result in this case. The government was procuring a multi-million dollar federal project with the environment and safety of the people of New Jersey at stake. The Contracting Officer learned during the pre-award survey that Geo–Con's own reference, Weyerhauser, was not satisfied with similar work being done by Geo–Con. The Contracting Officer also learned, without being so informed by Geo–Con, that the company had previously done similar work for the government—with disastrous results, leading to criminal charges being brought against Geo–Con employees. Finally, the qualifications of the person submitted by Geo–Con to be project manager appeared deficient. Under these circumstances, the Contracting Of-

ficer's decision not to award the contract to Geo–Con was perfectly rational.

The Contracting Officer's decision in this case comports with the facts and the law. The Federal Acquisition Regulations (FAR) provide that if the Contracting Officer does not have information before him "clearly indicating that a prospective contractor is responsible, the Contracting Officer shall make a determination of nonresponsibility." 48 C.F.R. § 9.103(b). The prospective contractor always bears the burden of persuading the Contracting Officer that it is responsible. *Cubic Corp. v. Cheney,* 914 F.2d 1501, 1502 (D.C.Cir.1990). In this regard, the burden is on the prospective contractor to prove a satisfactory record of integrity and performance. 48 C.F.R. § 9.104.1. A contractor that recently has been found "seriously deficient in contract performance" is presumed nonresponsible. 48 C.F.R. § 9.104–3(c).

■ For the plaintiff to sustain its burden on a motion for preliminary injunction, the plaintiff must demonstrate, among other things, a substantial likelihood of success on the merits. *See Washington Merto. Area Transit Auth. v. Holiday Tours, Inc.,* 559 F.2d 841, 844 (D.C.Cir.1977). This the plaintiff has been unable to do. To the contrary, the government has demonstrated that it is entitled to summary judgement on the basis of the uncontroverted facts and the law. The government is not, and should not be required to blindly purchase services from the lowest cost supplier. The government must carefully examine the supplier's credentials and past performance record, awarding a contract only when satisfied of the prospective awardee's ability and integrity. On the undisputed record in this case, the Court can find no fault with the Contracting Officer's decision.

An appropriate order accompanies this opinion.

## ORDER

Having considered plaintiff's motion for preliminary injunction, defendants' motion for summary judgment, all opposition thereto, argument by the parties, and for the reasons stated in the foregoing memorandum opinion, it is hereby

ORDERED that plaintiff's motion for preliminary injunction be denied; and it is further

ORDERED that defendants' motion for summary judgment be granted.